**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DEAN W. WEARY, | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION NO. 4:11-CV-01182 |
| | : | |
| vs. | : | (Complaint Filed 6/22/11) |
| | : | |
| MICHAEL J. ASTRUE, | : | |
| COMMISSIONER OF SOCIAL | : | (Judge Caputo) |
| SECURITY, | : | |
| | : | |
| Defendant | : | |

**MEMORANDUM**

**BACKGROUND**

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Dean W. Weary's claim for social security disability insurance benefits.

On July 15, 2008, Weary filed protectively[1] an application for disability insurance benefits. Tr. 11, 26 and 173.[2]  The application was initially denied by the Bureau of Disability Determination[3] on December 18, 2008. Tr. 89-94. On February 10, 2009, Weary requested a hearing before an administrative law judge. Tr. 100.  After about 15 months had

---

[1]Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

[2]References to "Tr._" are to pages of the administrative record filed by the Defendant as part of his Answer on August 24,  2011.

[3]The Bureau of Disability Determination is a state agency which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration. Tr. 90.

passed, a hearing was held on May 19, 2010. Tr. 24-68.   On July 13, 2010, the administrative law judge issued a decision denying Weary's application. Tr. 11-19.   On August 18, 2010, Weary filed a request for review with the Appeals Council and on May 5, 2011, the Appeals Council concluded that there was no basis upon which to grant Weary's request. Tr. 1-7.   Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Weary then filed a complaint in this court on June 22, 2011.   Supporting and opposing briefs were submitted and the appeal[4] became ripe for disposition on October 31, 2011,  when Weary elected not to file a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes.   The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."   It is undisputed that Weary met the  insured status requirements of the Social Security Act through December 31, 2011. Tr. 11, 13, 26, 162 and 173.

Weary, who was born in the United States on April 17, 1961,[5] graduated from high school in 1979 and can read, write, speak and understand the English language and

---

[4]Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

[5]At the time of the administrative hearing and the administrative law judge's decision, Weary was  49 years of age and considered a "younger individual" whose age would not seriously impact his ability to adjust to other work. 20 C.F.R. § 404.1563(c). The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

perform basic mathematical functions. Tr.  17, 36-37, 176 and 183. During Weary's

elementary and secondary schooling, he attended regular education classes. Tr. 36 and 183.

Weary also had vocational training in carpentry. Id.

Weary has past relevant employment[6] as an appliance delivery worker, dump

truck driver and heavy equipment operator. Tr. 60-61.  Those positions were described by

a vocational expert as unskilled to skilled, medium to very heavy work. Id. [7]

_____

[6]Past relevant employment in the present case means work performed by Weary
during the 15 years prior to the date his claim for disability was adjudicated by the
Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

[7]The terms sedentary, light, medium, heavy and very heavy work are defined in the
regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting
> no more than 10 pounds at a time and occasionally
> lifting or carrying articles like docket files, ledgers, and
> small tools. Although a sedentary job is defined as one
> which involves sitting, a certain amount of walking and
> standing is often necessary in carrying out job duties.
> Jobs are sedentary if walking and standing are required
> occasionally and other sedentary criteria are met.

> (b) *Light work*.  Light work involves lifting no more
> than 20 pounds at a time with frequent lifting or
> carrying of objects weighing up to 10 pounds.  Even
> though the weight lifted may be very little, a job is
> in this category when it requires a good deal of
> walking or standing, or when it involves sitting most
> of the time with some pushing and pulling of arm or leg
> controls.  To be considered capable of performing a
> full or wide range of light work, you must have the
> ability to do substantially all of these activities.
> If someone can do light work, we determine that
> he or she can also do sedentary work, unless there
> are additional limiting factors such as  loss of fine
> dexterity or inability to sit for long periods of time.

> (c) *Medium work*.  Medium work involves lifting no

3

Weary alleges that he became disabled on June 14, 2008, the day after an unfavorable decision on a prior application,  because of elbow, shoulder, neck, and back disorders, and depression. Tr. 26-27, 177 and 220.  In documents filed with the Social Security Administration Weary claimed that he could not work because of widespread pain, including pain in his left shoulder, neck, elbows, right knee and lower back. Tr. 177 and 194. Weary contends that he suffers from depression and anxiety which impairs his memory and ability to concentrate, complete tasks and follow and understand instructions. Tr. 191.

In a document filed with the Social Security Administration in conjunction with Weary's application for benefits, Weary indicated that he stopped working on April 5, 2006, and received retirement disability from the Pennsylvania Department of Transportation because he had "permanent work restrictions and they wouldn't let [him] come back with the restrictions." Tr. 29 and 177.  After retiring Weary applied for unemployment compensation

more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

(d) *Heavy work*.  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

(e) *Very heavy work*.  Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.  If someone can do very heavy work, we determine that he or she can also do heavy, medium, light and sedentary work.

20 C.F.R. § 404.1567.

benefits asserting that he could perform light duty work. Tr. 29.   Weary was awarded unemployment compensation benefits  and continued to receive the same up until about six months before the administrative hearing, i.e., December, 2009. Tr. 33-34.

The administrative law judge questioned Weary regarding his application for unemployment compensation benefits and his receiving the same well after his alleged disability onset date of June 14, 2008.  Tr. 29-35.  That exchange in relevant part was as follows:

Q. And since June 14, 2008, sir, how many did you have in your household at that time.  When you said you became disabled, June 2008.

A. My son and my mother live with me.

\*       \*       \*       \*       \*       \*              \*

Q . . . And how many do you have now, sir?

A. Three.

Q. Same three?

A. Yes.

Q How old is your son?

A. 13.

\*       \*       \*       \*       \*       \*              \*

Q. Does your mother work outside the home?

A. No. She's 83 years old.

Q. What monies are coming in to the household to you, your son, or your mother since June 14, 2008?

A. I was getting unemployment which has stopped now. . . . . And I get a disability from the state. It's for my retirement.

\*      \*      \*      \*      \*         \*            \*

Q. An how long did you receive unemployment, sir?

A Oh, until about six months ago.

\*      \*      \*      \*      \*         \*            \*

A. They said I could go on light duty where I was working. You're eligible for unemployment if you're eligible for light duty.

\*      \*      \*      \*      \*         \*            \*

Q . . . Now to receive unemployment insurance, sir, unemployment is a federal program which is administered by the state government.  It has certain requirements.  For you to receive those benefits you had to meet those requirements.  I'm going to cover a couple of them for you. To get unemployment benefits, sir, especially over that long a period of time, you have to give information to that agency on a regular basis.  This is typically done by telephone, by computer, every two weeks.  Did you give the information to that agency on a regular basis, sir?

A. Yes, I did.

Q. You're also required to tell them that you're able to work. Did you tell them you were able to work?

A. Yes.

Q. What work did you consider yourself able to do for this extended period?

A. I applied – it would depend. Light duty.

Q. Such as what, sir?  Again, you said it [was] over a long period of time. I'm just asking what kind of work you believed yourself able to do when you told them this.

A. Oh, I don't know.  I could've tried jobs.  I don't know if I could've did them or not.

Q. You told them you were able, sir. I'm just trying to clarify.

A. I applied for some.  UniMarts. I don't know where all, but I never heard nothing.

6

   \*      \*      \*      \*      \*      \*      \*

Q . . . So during the period that you received unemployment until about six months ago you thought that you were able to do light duty work, and that's what you told the agency.  I 'm assuming therefore at some point you changed your mind and believed you were unable to do any kind of work?

A.  I've looked for jobs and I can't get one.

Tr. 28-31 and 34-35.  The administrative law judge went on to attempt to pinpoint a date when Weary felt that he could no longer perform light duty work and Weary responded by stating that there was "[n]o particular date." Tr. 35.

Records of the Social Security Administration reveal that Weary had reported earnings in 1977 through 2006. Tr. 163.   Weary's total earnings during those years were $383,967.97. Id.  Weary has not worked since April, 2006. Tr. 177.

For the reasons set forth below we will affirm the decision of the Commissioner denying Weary disability insurance benefits.

## STANDARD OF REVIEW

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin.,  181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's

findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence.");  Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001);  Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which

evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-707.   Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance claims.  <u>See</u> 20 C.F.R. §404.1520; <u>Poulos</u>, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial

9

gainful activity,[8] (2) has an impairment that is severe or a combination of impairments that is severe,[9] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[10] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[11]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and

---

[8]If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further.

[9] The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 404.1523 and 404.1545(a)(2).

[10]If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

[11]If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities.  Id; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

## MEDICAL RECORDS AND OTHER EVIDENCE

The medical records reveal that Weary was treated for both physical and psychological problems.  We will commence with some of Weary's medical records that predate his alleged disability onset date of June 14, 2008.

The medical records reveal that Weary has a history of left shoulder surgery. Tr. 291-292.   A report of an x-ray of Weary's left shoulder dated August 22, 2005, states as follows: "Comparison is made to shoulder films of 08/02.  Total shoulder prosthesis is seen in place.  It is well seated without evidence of dislocation or a fracture." Tr. 292. X-rays of the left shoulder on May 23, 2006, revealed "stable alignment of all components" and "[n]o evidence of loosening or hardware failure." Tr. 291.

On November 1, 2006, Michael J. Oplinger, M.D., of Appalachian Orthopedic Center, Ltd., Carlisle, Pennsylvania, reported the following: "Mr. Weary returns to the office for a recheck of his left shoulder and left arm.  The left shoulder is doing pretty good.  He has near full range of motion today without any pain." Tr. 239.

On June 7, 2007, Weary had an appointment regarding his left arm with Dr. Oplinger at which Weary complained of pain "all over the place, his shoulder, his back, his leg, his arm, but everything is intermittent." Tr. 392.  The results of a physical examination were normal, including normal range of motion in the shoulder and normal muscle strength

"throughout.".  Id.  Dr. Oplinger referred Weary for an electromyography (EMG).[12]  Id.  The EMG was conducted on June 20, 2007, and Dr. Oplinger in notes of an appointment with Weary on June 28, 2007, stated that the results were "essentially within normal limits" with "no evidence of ulnar nerve compression, median nerve compression, or cervical radiculopathy." Tr. 396.  According to Dr. Oplinger,  at the appointment on June 28, 2007, Weary stated that his arm was not as bad as his lower back and he complained of "more back pain again."  Id.   Weary requested further treatment for his back. Id.  A physical examination of Weary by Dr. Oplinger revealed "some mild tenderness to palpation" in the back, "full range of motion of his hips, knees, and ankles bilaterally without pain," and normal muscle strength, reflexes and sensation to light touch in the bilateral lower extremities. Id.  Dr. Oplinger referred Weary to physical therapy.  Id.

Weary had a follow-up appointment with Dr. Oplinger on October 25, 2007, regarding his complaints of low back pain. Tr. 235.  At that appointment Weary stated that physical therapy had helped but that when he stopped the therapy his pain got worse.  Id.  A physical examination of Weary by Dr. Oplinger revealed "tenderness at his low back, some radicular-type symptoms in the right lower extremity" which "radiat[ed] down the posterior aspect of his leg and thigh, but [with] no significant numbness or tingling." Id.  Dr. Oplinger again referred Weary to physical therapy.  Id.

The next appointment Weary had with Dr. Oplinger was on May 6, 2008, about a month before his alleged disability onset date. Tr. 233.   At that appointment Weary

_____

[12]"Electromyography (EMG) is a test that checks the health of the muscles and the nerves that control the muscles." Electromyography, MedlinePlus Medical Encyclopedia, http://www.nlm.nih.gov/medlineplus/ency/article/003929.htm (Last accessed July 20, 2012).

complained of a "flareup" of back pain. Id.   The notes of this appointment indicate that Weary had been fishing about a week before the appointment where he bent over which resulted in "immediate pain in [the] right side of his lower back." Id.  Weary stated that all of his pain was in his lower back and he did not have "pain radiating down his leg or to his foot." Id.  Although Weary complained of "a little bit of discomfort in his buttock region, " he  denied numbness or tingling in his lower extremities. Id.  Weary had no other physical or psychiatric complaints. Id.  A physical examination revealed "some mild tenderness in his lower lumbar sacral region on the right" but none on the left and he had no muscle spasm. Id.  Weary had full range of motion of his hips, knees and ankles "without pain" and he had normal muscle strength, sensation and reflexes in the bilateral lower extremities.  Id.   An examination of Weary's left shoulder revealed full range of motion and normal muscle strength. Id.   Dr. Oplinger merely recommended that Weary treat his low back with "heat and rest" and "lumbar stabilization exercises, local modalities and stretching." Id.

An MRI of Weary's lumbar spine on May 29, 2008, revealed the following: "Degenerative lumbar disc disease with diffuse degenerative bulge at L4/L5 and L5/S1. Disc bulge is relatively mild and more diffuse in nature on today's study than when compared with the previous one performed in 2003. Disc bulge at L5/S1 is also diffuse and relatively mild in nature.  There has been no significant interval change." Tr. 289.

At an appointment with Dr. Oplinger on June 4, 2008, Weary continued to complain of low back pain but also complained of "numbness that is shooting down both legs intermittently." Tr. 230.  Dr. Oplinger referred Weary to a pain clinic for evaluation and "a possible epidural injection." Id.

On June 18, 2008, Weary had an appointment with Cumberland Valley Pain Management. Tr. 301-302.    When the examining medical provider reviewed Weary's systems,[13] Weary denied any psychiatric problems. Tr. 301.   A physical examination revealed that Weary's spine was within normal limits; and Weary had normal motor strength, reflexes and sensation. Tr. 302.  Weary did have a positive straight leg raise test on the right at 15 degrees.[14] Id.

On June 23, 2008, Weary had an MRI of the cervical spine which revealed the following: "Rightward asymmetric bulge or a small disc protrusion at C4/5.  This encroaches upon the right sided neural foramina at this level. There is no significant encroachment upon the neural canal or cervical spinal cord.  Mild broad based degenerative bulge of the C5/6 intervertebral disc.  No intrinsic abnormality is seen within the cervical spinal cord." Tr. 295.

Weary received lumbar epidural steroid injections on June 20 and July 7 and 22, 2008. Tr. 298-300.

On August 5, 2008, Weary informed a treating healthcare provider at Cumberland Valley Pain Management that his pain was a "1-2" on a scale of 1 to 10. Tr. 297.

---

[13]"The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to uncover dysfunction and disease." A Practical Guide to Clinical Medicine, University of California, School of Medicine, San Diego, http://meded.ucsd.edu/clinicalmed/ros.htm (Last accessed July 20, 2012).

[14]The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc.  The patient, either lying or sitting with the knee straight, has his or her leg lifted.  The test is positive if pain is produced between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated-discs-straight-leg-raise (Last accessed July 20, 2012). A positive finding at less than 30 degrees suggests something other than a herniated disc is pressing on a nerve root. Id.

Weary was prescribed Baclofen[15] for his pain complaints and advised to return for a followup appointment in 3 weeks.  Id.   When Weary returned, he reported right-sided neck pain which radiated into the back of his head at a pain level of 1 on a scale of 1 to 10. Tr. 382. Although Weary was offered cervical epidural steroid injections, Weary was "unsure" about proceeding, so he was advised to return in 1 month.  Id.

Weary had an appointment with Dr. Oplinger on September 11, 2008, at which Weary complained of left elbow pain.  Tr. 423.   Dr. Oplinger's assessment was that Weary suffered from lateral epicondylitis of the left elbow[16] and recommended an injection of a corticosteroid.  Id.   Weary refused the injection and stated that he would return if the pain continued. Tr. 423.

At the end of September, 2008, Weary had an appointment with Spring Road Family Practice at which he complained of recently suffering right knee pain but that presently his knee was "fine." Tr. 427.  An examination of the knee reveal normal findings. Id.  The examining physician, V. Ramirez, M.D., was of the opinion that Weary "may have OA [osteoarthritis] that flares up on him." Id.

Weary had an appointment with Cumberland Valley Pain Management on October 2, 2008, at which Weary reported "lots of nervous energy." Tr. 381.  Weary indicated that his back pain was 2 and his neck pain was a 6 on a scale of 1 to 10.  Id. Weary informed the treating medical provider that he was "going to try [a] chiropractor." Id.   A follow-up

---

[15]Baclofen, a muscle relaxer and antispastic agent, is used to treat muscle pain, spasm and stiffness.  Baclofen, Durgs.com, http://www.drugs.com/baclofen.html (Last accessed July 24, 2012).

[16]This conditions is generally referred to as tennis elbow, a condition of inflammation cause by overuse.  See Dorland's Illustrated Medical Dictionary, 630 (32nd Ed. 2012).

appointment was scheduled for October 30, 2008. Id.

On October 7, 2008, Weary had an MRI of the right knee which revealed degenerative joint disease, "a probable tear of the posterior horn of the medial meniscus," and a "possible sprain or degeneration of the lateral collateral ligament." Tr. 383. The cruciate ligaments were intact.[17] Id.

On October 14, 2008, Weary had an appointment with Dr. Oplinger for evaluation of his right knee pain, "a new problem." Tr. 428. At this appointment, Weary stated that he was "feeling much better" and was "having no pain or discomfort." Id. A

---

[17]The knee is made up of the following three bones: the tibia (shinbone), the femur (the thigh bone) and the patella (the kneecap).  The femur and tibia meet to form a hinge joint which is protected in the front by the patella.  The ends of the tibia and femur and the underside of the patella are covered by cartilage which acts to cushion the knee joint. The entire knee joint is enclosed in a capsule lined with special tissue called synovium, which produces a thick liquid called synovial fluid and which is necessary to lubricate the knee joint.  The knee is kept in alignment by ligaments and tendons.  There are two large ligaments, the cruciate ligaments, in the center of the knee which cross each other which prevent the shinbone from moving forward and backward on the thighbone.  There are also ligaments on both  sides of the knee: the medial collateral ligament and the lateral collateral ligament and which provide stability when the knee moves from side to side. Between the thighbone and the shinbone are two rings of cartilage called menisci which provide stability and cushion the joint, acting as shock absorbers. The medial meniscus is closest to the center of the body and the lateral meniscus is the farthest away from the center of the body. The medial meniscus is partially attached to the medial collateral ligament.  The lateral meniscus is not attached to the lateral collateral ligament.  There are also two major tendons connected to the kneecap: (1) the tendon below the kneecap is called the patellar tendon although technically it is a ligament since it connects the kneecap or patella to another bone, the tibia or shinbone, and (2) the tendon above the kneecap is the quadriceps tendon.  See, generally, Elizabeth Quinn, Knee Anatomy and Physiology, About.com:Sports Medicine, http://sportsmedicine.about.com/od/kneepainandinjuries/ a/Knee_Anatomy.htm (Last accessed July 24, 2012); Vicent Iannelli, M.D., Knee Problem Treatment Guide: Major Structures of the Knee, About.com:Pediatrics, http://pediatrics.about.com/cs/conditions/a/knee_problems_2.htm. (Last accessed July 24, 2012); Carol & Richard Eustice, The Cause of Knee Pain: Step-By-Step, About.com:Arthritis, http://arthritis.about.com/od/arthritisbyanatomy/ss/causejointpain _2.htm (Last accessed July 24, 2012).

physical examination revealed that Weary had full range of motion of his left hip without pain, full range of motion of his right knee, a negative Lachman's sign,[18] a negative varus and valgus stress test,[19] normal sensation to light touch in all dermatones,[20] and no skin lesions were present.  Id.   Dr. Oplinger's assessment was that Weary suffered from degenerative joint disease of the right knee with some meniscal pathology, but more related to Weary's arthritis. Id.   Dr. Oplinger recommended that Weary continue to work on his strength and motion and if his symptoms worsened, he would recommend standing x-rays. Id.

At an appointment with Cumberland Valley Pain Management on October 30, 2008, Weary stated that the Baclofen was working and his pain level was a 1 on a scale of 1 to 10.  Tr. 381.

Ronald Vandegriff, D.O., examined Weary on behalf of the Bureau of Disability Determination. Tr. 326-333.  Weary told Dr. Vandegriff that he was "unable to work because

---

[18]The Drawer's or Lachman's test or sign is to determine whether there is a rupture of the anterior or posterior ligaments of the knee. See Dorland's Illustrated Medical Dictionary, 1888 & 1893-1894 (32nd Ed. 2012).

[19]This is a test where stress is placed on the knee in the direction of the center of the body (varus/medial) and also away from the center of the body (valgus/lateral).  The valgus stress test is to assess the health of the medial collateral ligament.  The varus stress test is to assess the health of the lateral collateral ligament. See  Walter L. Calmbach, M.D., et al., Evaluation of Patients Presenting with Knee Pain: Part 1. History, Physical Examination, Radiographs, and Laboratory Tests, American Family Physician, A peer-reviewed journal of the American Academy of Family Physicians, http://www.aafp.org/afp/2003/0901/p907.html (Last accessed July 24, 2012).

[20]A dermatone is an area of the skin mainly supplied by a single spinal nerve, There are 8 such cervical nerves, 12 thoracic, 5 lumbar and 5 sacral. A problem with a particular nerve root should correspond with a sensory defect, muscle weakness, etc., at the appropriate dermatone. See Stephen Kishner, M.D., Dermatones Anatomy, MedscapeReference, http://emedicine.medscape.com/article/1878388-overview (Last accessed July 24, 2012).

of neck pain, low back pain, and stress." Tr. 326.  Weary indicated the stress was "because of going through a separation and divorce and his wife moved back into the house."  Id. When examining Weary, Dr. Vandegriff noted that Weary was able to get on and off the examination table without any difficulty or problems.  Tr. 327.  After examining Weary, Dr. Vandegriff on October 14, 2008, completed a functional assessment of Weary, including a range of motion chart. Id.   The range of motion chart reveals that Weary had full range of motion in his right shoulder, elbows, wrists and ankles. Tr. 332-333.   With respect to the left shoulder Weary had full range of motion other than forward flexion and abduction were reduced from 150 degrees to 130 degrees. Tr. 332.  Weary had full flexion-extension of the left knee but flexion-extension was reduced from 150 degrees to 100 degrees in the right knee.  Id.  Lateral flexion (towards the shoulder) of the cervical spine was reduced from 40 degrees to 30 degrees but flexion, extension and rotation were normal.  Tr. 333.    Lumbar flexion-extension (bending forward) was reduced from 90 degrees to 80 degrees but lateral flexion was normal.  Id.   Weary had normal muscle strength (5/5) in the extremities and normal reflexes. Tr. 328.  Dr. Vandegriff found that Weary could lift up to 10 pounds frequently and 20 pounds occasionally, stand/walk 3 hours in an 8-hour workday, with no limitation in sitting. Tr. 330.  Dr. Vandegriff found that Weary had the ability to push and pull the same amount that he could lift and/or carry. Id.  He was of the opinion that Weary could bend and kneel occasionally, but should never stoop, balance, crouch or climb. Tr. 331.  Dr. Vandegriff found that Weary had no limitations with respect to  reaching, handling, fingering, feeling, seeing, hearing, speaking, tasting, smelling or continence.  Id.   He concluded that Weary should avoid heights and moving machinery. Id.

On December 16, 2008, Vinaykant N. Shah, M.D., reviewed on behalf of the

Bureau of Disability Determination Weary's medical records and concluded that Weary could perform a limited range of light work.  Tr. 334-340.  Dr. Shah concluded that Weary could lift and/or carry 20 pounds occasionally and 10 pounds frequently; Weary could stand and/or walk 6 hours in an 8-hour workday and sit about 6 hours in an 8-hour workday; Weary could occasionally use ramps and stairs but he could never climb ladders, ropes or scaffolds; Weary could frequently balance, stoop and kneel; Weary could occasionally crouch and crawl; Weary had no manipulative limitations, such as reaching, handling, fingering and feeling; and Weary had no visual, communicative or environmental limitations. Id.

On December 18, 2008, John N. Grutkowski, Ph.D., reviewed on behalf of the Bureau of Disability Determination Weary's medical records and concluded that Weary did not have a severe mental impairment. Tr. 341.   Dr. Grutkowski found that Weary had no restrictions of activities of daily living; no difficulties maintaining social functioning; mild difficulties in maintaining concentration, persistence and pace; and no repeated episodes of decompensation of an extended duration. Tr. 351.   Dr. Grutkowski noted that Weary is functional and independent with respect to activities of daily living. Tr. 353.

In April, 2009, Weary commenced receiving mental health counseling at Leedy/Abbey Counseling Services.[21] Tr. 370-373 and 375-376.    Weary was initially screened by Anne Leedy, a therapist. Id.  Therapist Leedy on April 1, 2009, concluded that Weary suffered from dysthymia[22] and gave Weary a Global Assessment of Functioning

---

[21]The initial screening documents refer to "Leady/Abbey Counseling Services." Tr. 370 and 376.

[22]Dysthymia is a form of mild depression. See Dorland's Illustrated Medical Dictionary, 582 (32nd Ed. 2012).

(GAF) score of 56.[23]  Tr. 373.   Therapist Leedy performed a mental status examination of Weary and found that Weary had normal appearance, appropriate affect, restless motor behavior, intact memory, coherent thought processes, an anxious mood, fair insight and judgment, fair attention and concentration, and no suicidal or homicidal ideas or plans.  Tr. 376.  Ms. Leedy found that Weary's language comprehension was fair and the rate, tone and volume of his speech was appropriate.  Id.

On April 15, 2009, Weary was evaluated by Sandra Abbey, a certified registered nurse practitioner, of Leedy/Abbey Counseling Services. Tr. 359-361.  Ms. Abbey is referred to as a psychiatric nurse practitioner. Tr. 361.  Weary told Ms. Abbey that he "just

---

[23]The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id.  The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination.  The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning.  The GAF is within a particular range if <u>either</u> the symptom severity <u>or</u> the social and occupational level of functioning falls within that range.  When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the <u>worse</u> of the two.  Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20.  A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas.  A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas,  such as work or school, family relations, judgment, thinking or mood. Id.  A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  Id.  A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id.  A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. Id.  A GAF score of 71 to 80 represents transient symptoms, if present, and expectable reactions to psychosocial stressors or no more than slight impairment in social, occupational, or school functioning.  Id.

can't do anything." TR. 359.    A mental status examination revealed that Weary was appropriately dressed, but had marginal grooming, very poor eye contact, and a blunted and restricted affect. Tr. 360.  Weary denied suicidal and homicidal ideations. Id.  Weary had no obvious obsessive-compulsive behaviors, tics, delusions or hallucinations.  Id.    His intelligence appeared average but his insight and judgment were poor. Id.    Ms. Abbey concluded that Weary suffered from major depressive disorder, recurrent, moderate; and dysthymia.  Id.  She gave Weary a current GAF score of 50 and a highest GAF score in the past year of 65.  Id.   Ms. Abbey prescribed Wellbutrin, an antidepressant, and Elavil, for insomnia, and recommended outpatient therapy. Tr. 361.

On May 13, July 1, August 26, November 4, 2009, and April 7, 2010,  Weary had follow-up appointments with Ms. Abbey.  Tr. 362-369 and 385-386.

At the appointment on May 13, 2009, Weary reported that he thought the medication helped and he had some increased energy until he developed a respiratory infection. Tr. 362-363.  Ms. Abbey noted that Weary had a normal appearance with good hygiene. Tr. 363.    Weary's affect was appropriate, his mood euthymic;[24] his thought processes were coherent, and his memory intact. Id.  Ms. Abbey's diagnosis was the same (i.e., major depressive disorder and dysthymia) but she increased Weary's GAF score to 65.

At Weary's appointment with Ms. Abbey on July 1, 2009, Weary reported that he was not sleeping well because of pain. Tr. 366-367.  Weary's mental status examination was unchanged and entirely normal other than complaints of eating more and having less

---

[24]Euthymic is defined as "pertaining to a normal mood in which the range of emotions is neither depressed nor highly elevated." Mosby's Medical Dictionary, 8th edition, 2009. http://medical-dictionary.thefreedictionary.com/euthymic (Last accessed July 24, 2012).

energy. Tr. 367.  Ms. Abbey's diagnosis was unchanged and she increased Weary's dosage of Elavil. Id.  Ms. Abbey in the notes of this appointment did not record a GAF score.

On August 26, 2009, Weary reported that he was experiencing a lot of back pain recently and "laying around a lot" because of pain. Tr. 365.  A mental status examination revealed no abnormalities and Weary reported having more energy. Id.  Ms. Abbey's diagnosis was the same and she gave Weary a GAF score of 65. Id.  Ms. Abbey continued Weary's medications and advised him to return in 3 months. Id.

At the appointment on November 4, 2009, Weary reported that he was having issues with his family and was very angry, agitated, and cranky, but he also acknowledged a "great deal of noncompliance." Tr. 369.  He also reported his mother was in a nursing home because she had sustained a broken leg. Id.  Ms. Abbey's diagnosis was the same and she gave Weary a GAF score of 65.  Id.

Weary had appointment at Cumberland Pain Management in January and April, 2010. Tr. 378 and 390.  At the January appointment Weary reported a pain level of 3 on scale of 1 to 10 and at the April appointment a pain level of 2 on a scale of 1 to 10.  Id.

Weary at the appointment with Ms. Abbey in April, 2010, reported that things had improved because his mother had returned home. Tr. 386.  Weary, however, was still very agitated with family members, sleeping a lot, and "on edge." Id.  Ms. Abbey's diagnosis remained the same but she gave Weary a GAF score of 60. Id.

On May 5, 2010, Ms. Abbey at the request of Weary's attorney completed a medical source state of Weary's mental ability to do work-related activities. Tr. 387-389. In that document Ms. Abbey found that Weary had "marked" (serious limitation/the ability to function is severely limited but not precluded) or "extreme" (major limitations/there is no

22

useful ability to function) limitations in nearly all areas of mental work functioning. <u>Id.</u>   Ms. Abbey did, however, find that Weary had the capability to" manage benefits in his own best interest." Tr. 389.    The medical source statement does not indicate when the mental limitations commenced or how long those limitations were expected to last.   Tr. 387-389. Ms. Abbey also provided an undated handwritten note, not on letterhead, consisting of the following three sentences: "This is a very quick noted in reference to your fax.  I believe that on a day to day basis I use the GAF to estimate how the client is doing but if they are not employed I do not take it into consideration.  By pure GAF standards his is 10 points lower than stated." Tr. 391.   Taken at face value, this would reduce the GAF score of 65 on May 13, 2009, to 55(representing moderate limitations); the GAF score of 65 on August 26, 2009, to 55 ; the GAF score of 65 on November 4, 2009, to 55; and , the GAF score of 60 on April 7, 2010, to 50 (representing borderline serious/moderate limitations).

          After the alleged disability onset date, the record reveals that Weary lived in a house with his son and mother.  Tr. 186.   Weary is able  to take care of his daily personal needs, including bathing, caring for his hair, shaving and using the toillet. Tr. 187. Weary did claim that he has difficulty tying his shoe laces; dressing because of pain in his one arm, elbow and back; feeding himself because "it hurt[s] to pick [up a] frying pan with left [hand]"; and putting on shoes. Tr. 187.   Weary claims he "forget[s] thing[s] a lot" but needs no reminders to take medications. Tr. 188.  Weary prepares "some" of his own meals "usually twice daily." <u>Id.</u>   Weary admitted that he takes care of his son by seeing that his son gets dressed, eats breakfast and on the school bus in the morning. <u>Id.</u>  Weary indicated he was able to do cleaning, laundry and mowing. <u>Id.</u>   Weary has a driver's license and is able to drive; he is able to go out alone; he shops in stores for food and clothes once or twice a

week; and he is able to pay bills, count change, handle a saving account and use a checkbook and money orders. Tr. 189.   Weary told Ms. Abbey on April 15, 2009, that he takes his mother grocery shopping and other places because she is 82 years of age and cannot drive. Tr. 360.  Weary stated that his hobbies were watching TV,  fishing and golfing but that he does not  go fishing or golfing "anymore." Tr. 190.   Weary is able to visit and spend time with friends and talk on the telephone with no difficulty. Id.   Weary stated that he does not need to be reminded to go places and does not need someone to accompany him. Id.   When given an opportunity to do so, Weary did not indicate any problem with talking, hearing, seeing, or getting along with others. Tr. 191.   Weary uses no assistive devices to ambulate. Tr. 192.

On July 23, 2008, Weary was interviewed face-to-face  by K. Dengler,  an employee of the Social Security Administration, who observed that Weary had no difficulty with hearing, reading, breathing, understanding, coherency, concentrating, talking, answering questions, sitting, standing, walking, seeing, using his hands and writing. Tr. 174-175.

## DISCUSSION

The administrative law judge at step one of the sequential evaluation process found that Weary had not engaged in substantial gainful work activity since June 14, 2008, the alleged disability onset date. Tr. 13.

At step two of the sequential evaluation process, the administrative law judge found that Weary had the following severe impairments: "depression, anxiety, right knee degenerative joint disease, and left upper extremity pain and tendonitis status post 2005 shoulder surgery and April 2006 elbow surgery."  Id.

At step three of the sequential evaluation process the administrative law judge

24

found that Weary's impairments did not individually or in combination meet or equal a listed impairment. Tr. 13-14.

At step four of the sequential evaluation process the administrative law judge found that Weary could not perform his past relevant semi-skilled to skilled, medium to heavy work as an appliance delivery worker, a dump truck driver and heavy equipment operator but that he had the residual functional capacity to perform a limited range of unskilled, light work. Tr. 15-17.   Specifically, the administrative law judge found that Weary could perform unskilled, light work

> except he should avoid operating hand/arm levers with his left (non-dominant) upper extremity and foot and leg pedals with his right lower extremity but has no limitation with buttons or knobs.  In addition, the claimant retains occasional abilities in climbing stairs, stooping, kneeling, crouching and reaching in any direction with his left upper extremity but should avoid climbing rope, ladder/scaffolding and crawling.  The claimant should also avoid reaching overhead with his left upper extremity, working with vibrating objects or surfaces with his right lower extremity, working in high exposed places and working around fast moving machinery on the ground; has occasional abilities with exposure to extreme cold and water/liquids; and is limited to simple unskilled work with occasional direct dealings with the public.

Tr. 15.  In concluding that Weary had the residual functional capacity to engage in a limited range of unskilled, light work, the administrative law judge relied, *inter alia*, on the opinions of Dr. Vandegriff, Dr. Shah,  and Dr. Grutkowski.[25]  The administrative law judge rejected the "marked" and "extreme" mental limitations imposed by Ms. Abbey because they were inconsistent with the GAF scores assessed by Ms. Abbey .  Also, Ms. Abbey's assessment

---

[25]The administrative law judge to a great extent accepted Dr. Vandegriff's assessment of Weary's physical abilities.  One item she did not agree with was Dr. Vandegriff's conclusion that Weary could not engage in any stooping.  The rejection of that portion of Dr. Vandegriff's opinion was appropriate in light of Dr. Shah's assessment.

was in conflict with the assessment of Dr. Grutkowski who reviewed Weary's medical records on behalf of the Bureau of Disability Determination.

At step five, the administrative law judge based on a residual functional capacity of a limited range of light work as described above and the testimony of a vocational expert found that Weary had the ability to perform unskilled, light work as an electronics accessories assembler, an unarmed security guard, and a small products assembler, and that there were a significant number of such jobs in the national, state and local economies. Tr. 18.

The administrative record in this case is 435 pages in length and we have thoroughly reviewed that record. The administrative law judge did an adequate job of reviewing Weary's vocational history and medical records in her decision. Tr. 11-19. Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. Doc. 14, Brief of Defendant.

Weary argues that the administrative law judge erred when (1) the administrative law judge found that Weary could engage in occasional stooping, (2) the administrative law judge failed to obtain vocational testimony regarding the impact of an inability to stoop, (3) the only reaching restriction imposed by the administrative law judge was reaching overhead with the left upper extremity,[26] (4) she failed to give individual consideration to Weary's age and whether he should have been treated as the next age category, (5) she rejected the opinion of Ms. Abbey relating to Weary's "extreme" and "marked" limitations, and (6) she found that Weary's testimony was not credible. We find

---

[26]The record reveals that Weary is right-handed.  Tr. 35.

no merit in Weary's arguments.

The Social Security regulations require that an applicant for disability benefits come forward with medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled." 20 C.F.R. §§ 404.1512(c) and 416.912(c).  Weary failed to provide such evidence.  No physician, psychologist or therapist who treated Weary indicated that Weary was disabled for the requisite 12 month period required by the statute.[27] As for Weary's physical abilities, no treating or examining  physician provided a statement of Weary's work-related functional abilities or a statement that Weaver was either limited functionally or totally disabled on or after June 14, 2008, the alleged disability onset date.

In contrast, the opinions of Dr. Vandegriff, Dr. Shah and Dr. Grutkowski clearly supports the administrative law judge's determination at steps three and four of the sequential evaluation process.

Although Dr. Vandegriff's assessment provided that Weary should not engage in any stooping, the administrative law judge in her decision appropriately limited Weary to occasional stooping and pointed out that diagnostic studies, physical examination findings and Weary's activities suggested that Weary was not as limited in the area of stooping as Dr. Vandegriff suggested.  Tr. 16. The MRI of Weary's lumbar spine revealed only disc

---

[27]As stated earlier in this memorandum to receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

bulging at L4-5 and L5-S1. Tr. 16 and 289.    Furthermore, the range of motion chart prepared by Dr. Vandegriff reveals that Weary had almost normal lumbar range of motion. Tr. 333.  Dr. Shah after reviewing the medical records, including Dr. Vandegriff's opinion, found that Weary could engage in frequent stooping. The administrative law judge was not required to accept in toto Dr. Vandegriff's opinion and appropriately discounted Dr. Vandegriff stooping restriction in light of the opinion of Dr. Shah and the other evidence of record.  As for not eliciting testimony from the vocational expert regarding the impact of a stooping limitation, Weary's counsel had the opportunity to so question the vocational expert and declined to do so. Tr. 66-68.

Weary argues that the administrative law judge should have imposed additional restrictions regarding the use of his left upper extremity.  Specifically, he contends that the administrative law judge's residual functional capacity assessment should have concluded a limitation on his ability to lift his arm above waist-level.   No physician has indicated that Weary had such a limitation during the relevant time period, i.e., from the alleged disability onset date through the date of the ALJ's decision. Also,  Weary at the administrative hearing testified that he received no treatment for his left shoulder since his alleged disability onset date.  The opinions of Dr. Vandegriff and Dr. Shah fully support the administrative law judge's decision which provided that Weary could occasionally reach in any direction other than overhead with his left upper extremity.

Also, in December, 2010, after the administrative hearing Weary had an appointment with Dr. Oplinger. Tr. 431.  At that appointment Weary did not seek treatment for his shoulder and he did not request an updated opinion regarding any work restrictions he may have related to the shoulder surgery performed in August 2005. Tr. 46.

Notably, as far back as November, 2006, Dr. Oplinger indicated that Weary's shoulder was "doing pretty good" with "near full range of motion without any pain." Tr. 239. Furthermore, Dr. Vandegriff recommended no left-arm restrictions whatsoever and specifically stated that Weary was not limited in reaching, pushing or pulling even though he was aware of Weary's 2005 left shoulder replacement. Tr. 326 and 330-331.

Weary's contention that he should have been considered a "borderline" age case needs no elaborate discussion other than noting that even if Weary was designated a person closely approaching advanced age it would not affect the administrative law judge's decision.  The administrative law judge found that Weary could perform a limited range of light work, not sedentary work.[28]

Weary argues that the administrative law judge inappropriately rejected the "extreme" and "marked" mental limitations imposed by Ms. Abbey.  Ms. Abbey, a certified nurse practitioner, was not an "acceptable medical source"  under the Social Security regulation, who could render a diagnostic opinion regarding Weary's medically determinable mental impairments.  20 C.F.R. § 404.1513(a).[29]   Although Ms. Abbey could render an

---

[28]Under the Social Security regulations a person 50 to 54 years of age is considered a "person closely approaching advanced age." 20 C.F.R. § 404.1563(c).  The Social Security Administration considers a claimant 50 to 54 who has a severe impairment and limited work experience as someone who may not be able to adjust to other work. Id.  If Weary would have been considered a person closely approaching advanced age, limited to sedentary work  and also found to have no transferable job skills and unable to perform his prior relevant work by the administrative law judge, he would have been entitled to disability insurance benefits. See Medical-Vocational Rules 201.00(g) and  201.6, 20 C.F.R. Part 404, Subpart P, Appendix 2.

[29]Section 404.1513(a) states in relevant part as follows: "Sources who can provide evidence to establish an impairment.  We need evidence from acceptable medical sources to establish whether you have a medically determinable impairment(s). . . . Acceptable medical sources are – (1) Licensed physicians . . . (2) Licensed or certified psychologists. .

opinion under the regulations  as an "other source" regarding the severity of Weary's mental impairments, there is no preference given to her opinion and the administrative law judge did not err by preferring the opinion of Dr. Grutkowski, a licensed psychologist, over that of Ms. Abbey.[30]  In addition, Ms. Abbey's attempt in the handwritten note to clarify the GAF scores she assigned Weary does not appear to be in accordance with the standard practice of assigning GAF scores outlined in the DSM-IV.  Furthermore, even accepting the lower scores, the majority of those scores indicated that Weary only had moderate mental limitations and, consequently, were still inconsistent with the "marked" and "extreme" mental limitations assessed by Ms. Abbey.  Under the circumstances presented, the administrative law judge appropriately rejected Ms. Abbey's medical source statement of Weary's mental ability to engage in work-related activities.

The administrative law judge found that Weary suffered from several medically determinable severe physical and mental conditions, including depression and degenerative joint disease of the right knee.  The administrative law judge, however,  stated that Weary's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent that they were inconsistent with the ability to perform a limited range of unskilled, light work. Tr. 15-16.  The administrative law judge was not required to

---

. ."

[30]20 C.F.R. § 404.1513(d) states in pertinent part as follows: "Other sources.  In addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work.  Other sources include, but are not limited to – (1) Medical sources not listed in paragraph (a) of this section (for example, nurse practitioner, . . . ."

accept Weary's subjective claims regarding his physical and mental limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make).  It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility.").  Because the administrative law judge observed Weary when he testified at the hearing on May 19, 2010, the administrative law judge is the one best suited to assess the credibility of Weary.

The administrative law judge appropriately relied on the opinions of Dr. Vandegriff, Dr. Shah and Dr. Grutkowski.  The administrative law judge's reliance on those three opinions was appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011) ("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.

s/A.Richard Caputo
A. RICHARD CAPUTO
United States District Judge

Dated: July 25, 2012